**In re Richard E. SELF.**

**Appeal No. 81–542.**

United States Court of Customs and Patent Appeals.

Feb. 18, 1982.
Rehearing Denied April 22, 1982.

Roland T. Bryan, Stamford, Conn., for appellant.

Joseph F. Nakamura, Sol., John W. Dewhirst, Associate Sol., Washington, D. C., for Patent and Trademark Office.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

RICH, Judge.

This appeal is from the decision of the United States Patent and Trademark Office (PTO) Board of Appeals (board) sustaining final rejections of various claims, and making a new rejection under 37 CFR 1.196(b), in appellant's application serial No. 809,645, for reissue of U. S. Patent 3,514,074 for "High Energy Loss Fluid Control." We affirm.

### Background

Two problems which have long vexed the industrial control valve art are severe noise and valve damage due to cavitation and erosion. These problems are most serious in "severe service" applications, such as in refineries, chemical plants, and nuclear power plants. The aerodynamic noise generated at such facilities is often so great that it constitutes not only an occupational health hazard but also a public nuisance. Cavitation and erosion can drastically short-

en valve life. Cavitation is especially destructive. It occurs when a sudden decrease in pressure causes gas bubbles in a very rapidly flowing fluid, and then a sudden increase in pressure causes the bubbles to collapse. The resultant force can tear away the inside surfaces of a valve.

The invention is a fluid flow control device which reduces the velocity of fluids passing through it by forcing them through long, narrow channels which may have many abrupt turns. The velocity-reduction means specifically comprises a stack of abutting rings having grooves carved on their faces.* When stacked, the rings form a thick-walled hollow cylinder whose walls are penetrated by many tortuous, narrow channels. This configuration is said to prevent erosion-producing cavitation in fluids traversing the cylinder wall, and decreases noise which might otherwise attain harmful levels. Evidence of record tends to indicate that appellant's flow control devices are a tremendous commercial success.

Appellant filed a patent application for his fluid control device on May 6, 1968, and on May 26, 1970, was issued U. S. Patent 3,514,074. This patent has since been challenged in at least three lawsuits. In *Control Components, Inc. v. Valtek, Inc.*, No. 77–819 (S.D.Tex., filed May 26, 1977) (the Texas trial), a jury found patent claims 7, 14, and 17 unobvious, and claim 17 infringed. The findings concerning claim 17 were appealed and upheld. 609 F.2d 763 (5th Cir. 1980). The remaining two actions, according to appellant, are as yet unresolved.

On June 24, 1977, appellant filed the reissue application containing original patent claims 1 through 23 and new claims 45 through 65.

### The References

U. S. Patent 1,243,134 to Binckley discloses a discharge valve which prevents high-pressure water released from behind a dam from pouring out too quickly and thus causing noise, vibration, and erosion by en-

---

\* The primary drawings of the Self patent are reproduced in the appendix along with those of the references.

trained sand and silt. Velocity reduction is achieved by a grid-like baffle comprised of stacked disks of spaced, concentric annuli H-shaped in cross-section. The stacked disks form a cylinder, and water flow through the baffle is generally parallel to the axis of this cylinder. A hydraulically-controlled piston or plug within the cylinder varies the length of the path water must travel through the baffle in proportion to water inlet pressure. The greater the inlet pressure, the more baffle the water must traverse, and the more its velocity is reduced. Thus, water outlet velocity is maintained constant despite variations in inlet pressure.

Schlegel's German patent application 1,008,977 discloses a valve and restrictor which reduce the pressure of high-pressure steam. The restrictor comprises stacked plates, each having concentric annular gapped ridges which extend into spaces between gapped ridges on adjacent plates. The steam flows generally outward while being deflected at right angles by each obstruction it encounters, thus reducing its velocity.

U. S. Patent 3,397,794 to Toth et al. (Toth) describes a filter which abruptly alters the velocity of fluid to be filtered, thus inertially separating out entrained solids. The filter is a plurality of stacked annular disks. Ridges on the surface of each disk project outwardly from the inner wall and inwardly from the outer wall of each disk to form a baffle. Fluid enters through an aperture in the outer wall, travels generally along an arc of the disk where the ridges cause several abrupt turns, and then exits through an aperture in the inner wall. There are a plurality of apertures in each wall.

*The Rejections*

The board sustained rejections of claims 45 and 48–52 under 35 U.S.C. § 251 as expanding the scope of the claims of a patent more than two years after it had issued. It also sustained rejections under 35 U.S.C. § 102 of claims 22, 45, and 46 as anticipated by Binckley, and claims 22, 23, and 65 as anticipated by Schlegel. In addi-

tion, the board entered, under 37 CFR 1.196(b), a new § 102 rejection of claims 1–11, 13, 20, 21, and 22 as anticipated by Toth.

OPINION

*The § 251 Rejection*

■ The board sustained the examiner's rejection of claims 45 and 48–52 under § 251, the fourth paragraph of which provides:

No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent.

Here, the interval between the grant of the original patent and the application for reissue is nearly seven years, and so no claim broader in any respect than the original claims may now be allowed. *In re Ruth*, 47 CCPA 1014, 1016, 278 F.2d 729, 730, 126 USPQ 155, 156 (1960).

The board refused to allow the appealed claims because they call for "passageways" rather than "passageway grooves," the phrase used in the original claims. The board regarded the former phrase as manifestly broader than the latter. For example, tubes embedded in the faces of the annular disks would be "passageways" but not "passageway grooves."

Appellant challenges the board's position by contending that the interchangeable use of the two terms in the specification and claims of the original patent demonstrates that he considered them to be equivalent. He further contends that the jury's finding in the Texas trial, that a device having "passageways" but not "passageway grooves" infringed the original patent, shows the equivalence of these terms. Finally, he alleges that none of the new claims is impermissibly broad because none is broader than original patent claim 22.

None of these contentions overcomes the § 251 rejection. Original claim 22 is broad, and uses the term "passageways," but these passageways are in turn limited to those having "a substantial number of abrupt

turns between the inlet and outlet portions thereof," a limitation not appearing in any of the appealed claims. Thus, the new claims are broader than claim 22 in this respect, and there is no claim in the original patent which is as broad as the new claims. Equally lacking in factual support is appellant's argument that the treatment of the two expressions in question as equivalent in the original specification and claims shows their equivalence. With respect to claim language, claim 1 refers to "passageway grooves" twice, and then refers to "said passageways." Axiomatic grammar and semantics dictate that "passageways," occurring as it does after "said," serves only to identify an antecedent reference, the scope or meaning of which it does not alter. In the specification, the terms are substituted for one another liberally, but this fact alone does not establish their equal breadth in the claims, which alone is material. For example, one may refer to an automobile as either a motor vehicle or car, and use the terms interchangeably; yet the former is manifestly far broader than the latter. Similarly, here, the unadorned observation that a component of the invention is referred to with one term, then the other, says nothing about the relative breadth of those terms. This is certainly true where, as here, the generally understood meaning of "passageway grooves" is narrower than that of "passageways."

Finally, the jury finding of infringement is too ambiguous to be probative. It is unclear whether the jury found that the device literally infringed appellant's claims, or infringed under the so-called doctrine of equivalents. In any event, appellant's proffer of evidence that a single device infringes both the original and new claims has little bearing on whether the new claims embrace *any* conceivable apparatus which would not have infringed the original patent, which is the test we apply under *In re Ruth*, supra.

*The § 102 Rejection on Binckley*

▮ The board sustained rejections of claims 22, 45, and 46 as anticipated under § 102 by Binckley. These claims read:

22. In a high energy loss fluid control device having means defining a fluid flow passage, the improvement of means in said passage subdividing and confining fluid flow through the passage into a plurality of individual passageways, each having a long length to diameter ratio and a substantial number of abrupt turns between the inlet and outlet ends thereof creating a frictional drag and pressure drop on fluid flowing therethrough to dissipate potential energy of the fluid and control velocity of the fluid.

45. In a high energy loss flow control device for installation in a fluid transfer system where a potentially destructive or noise generating fluid pressure differential exists:

a rigid annular structure comprising members having abutting faces and enclosing therebetween a plurality of individual passageways in parallel flow at spaced positions, each passageway configurated along its length (1) to have at least one restriction and a succeeding abrupt expansion portion in its length between inlet and outlet ends thereof and (2) to have an effective long length to diameter ratio to impart fixed high frictional resistance losses to fluid flow therethrough;

and means for compelling flow of the fluid into the inlet ends of said passageways, said means including a valve housing having a fluid passage of substantial cross-sectional flow area therethrough, said rigid annular structure mounted in said housing and across said passage to compel all fluid flowing through said passage to travel therethrough, and a valve plug in controlling relation to said plurality of passageways at spaced positions movable reciprocally within said annular structure.

46. In a high energy loss flow control device having means defining a fluid flow passage, the improvement of means in said passage subdividing and confining fluid through the passage into a plurality of individual passageways in parallel flow at spaced positions, each passageway hav-

ing a long length to diameter ratio and a substantial number of abrupt turns between the inlet and outlet ends thereof creating a frictional drag and pressure drop on fluid flowing therethrough to dissipate potential energy of the fluid and control velocity of the fluid, said first-mentioned means including a valve housing having a fluid passage of substantial cross-sectional flow area therethrough, said last-mentioned means comprising an annular structure mounted in said housing and across said passage to compel all fluid flowing through said passage to travel therethrough, and a valve plug in controlling relation to said plurality of passageways at spaced positions movable reciprocally within said annular structure.

The board agreed with the examiner's rejection of these claims, described in the Examiner's Answer as follows:

The claims read on the Binckley device as follows, taking claim 22 as an example. Claim 22 is drawn to a restrictor and calls for a "high energy loss fluid control device". This type of device is described in the reference, Binckley, page 1, lines 38–43. Claim 22 further recites a "means" in the passage "subdividing and confining fluid flow through the passage into a plurality of individual passageways", which corresponds to the stack of discs, C, of the reference. With respect to the expression in claim 22 of "individual passageways", appellant's disclosure does not require that the passageways be separate and unconnected from each other. For example, appellant's Figure 4 modification, to which claim 12 is apparently drawn, shows numerous interconnected individual passageway grooves. Claim 22 also calls for the passageways having "long length to diameter ratio" which reads on the reference as the distance from the top disc member to the lowermost disc member which is long in length compared to the spacing between the members through which the fluid flows in a restricted manner. Binckley further shows and as also called for in claim 22, the passageways having a substantial

number of abrupt turns creating a frictional drag and pressure drop to dissipate potential energy and control velocity of fluid. Note, in this connection, Binckley, p. 4, 1.19–27, "frictional retardation", and p. 4, 1.34–42, "diminution of velocity".

The remaining claims rejected on the Binckley reference call for * * *

—a valve plug movable in controlling relation, claims [45 and 46]; Binckley shows valve plug A:

—"abrupt turns between inlet and outlet ends" creating a frictional drag, claims 22, and 46; in the reference abrupt turns are located throughout the disc assembly:

—at least one restriction and a succeeding abrupt expansion portion or an increase in flow area, claims [22 and 45]; Binckley showing restrictions and expansion portions as the flow radiates outward and downward.

In attempting to overcome this rejection, appellant here renews the arguments which were unsuccessful before the board: that the structure of Binckley is different; that Binckley does not operate in the same way to accomplish the same result as the claimed invention; that Binckley is inoperative to accomplish its intended result, and therefore cannot anticipate; and that Binckley fails as an anticipation because it is nonenabling.

Many of appellant's arguments fail from the outset because, as the solicitor has pointed out, they are not based on limitations appearing in the claims. Thus, it is immaterial that Binckley is a variable head device, while the claimed invention is contemplated to be a constant head device, because appellant's claims are not limited to the latter. It is equally immaterial, with respect to claim 22, that Binckley uses a plug to obtain his desired result, as nothing in that claim precludes the use of a plug with the claimed subject matter. It matters not that Binckley does not operate in the same way to accomplish the same result where appellant has not limited his claims according to function or result.

Appellant has also failed to substantiate his contention that the Binckley device is inoperative to accomplish *its* intended result. The evidence appellant relies on establishes merely that cavitation may result in Binckley's device. Preventing cavitation, however, is an intended result of appellant's device, not necessarily Binckley's. Preventing erosion and noise were Binckley's goals, and each of these problems has many causes. Binckley's alleged failure to prevent one of those causes does not prove that he failed on other fronts. We also agree with the solicitor that Binckley is enabling because it is sufficiently clear to put *its* invention into the possession of one of ordinary skill in the art. The testimony adduced at the Texas trial which appellant cites as being to the contrary is inconclusive on this score, at best.

*The § 102 Rejection On Schlegel*

The board sustained the examiner's rejection of claims 22, 23, and 65 as anticipated under § 102 by Schlegel. Claim 22 is reproduced above. Claims 23 and 65 read:

23. The device of Claim 22 wherein the passageways increase in flow area from the inlet to the outlet ends thereof to accommodate expansion of fluid as the pressure thereon is reduced.

65. In a high energy loss fluid control device having means defining a fluid flow passage, the improvement of means in said passage subdividing and confining fluid flow through the passage into a plurality of individual passageways, said last named means including a rigid annular structure comprising a stack of abutting disks forming axially separated rows of generally radially directed passageways extending between the inner and outer circumferential walls of the structure, the passageways of each row each having a long length to diameter ratio, a substantial number of abrupt turns between the inlet and outlet ends thereof, and a labyrinth flow path progressively increasing in cross-sectional flow area from the inlet to the outlet ends; creating a frictional drag and pressure drop on fluid flowing therethrough to dissipate potential energy of the fluid and control velocity of the fluid.

The examiner read claim 22 on the Schlegel device as follows:

—"a high energy loss fluid control device" which subdivides and confines fluid flow "into a plurality of individual passageways"; the restrictor of Schlegel shown as comprised of disc 11 interposed between disc 17 and body 10, and passageways extending from the inner to the outer periphery of the discs:

—"each having a long length to diameter ratio"; the reference showing the passageway lengths from the inner to the outer periphery of the discs being long as compared to the flow path areas between the discs:

—"a substantial number of abrupt turns between the inlet ends thereof creating a frictional drag and pressure drop on fluid flowing therethrough to dissipate potential energy of the fluid"; the reference device having abrupt turns 5, 6, 7, 8, and 9 in one passageway and abrupt turns 12, 13, 14, 15, and 16 in a second passageway:

—"and control velocity of the fluid"; and as the reference points out in col. 1, lines 23–26 "to avoid the occurrence of supersonic velocities".

The board adopted this reasoning. With respect to claims 23 and 65, the board said:

Claim 23 reads on the radial expansion of the Schlegel passageways. Appellant's contention as to whether Schlegel attaches any significance to the increased flow area in the passageways is immaterial. By its very construction, the passageways in Schlegel will accommodate expansion of fluid as the pressure drops.

With respect to claim 65, Schlegel has rings or disks 11 and spacer washers (disks) all of which constitute a stack of abutting disks forming axially separated rows of radially direct passageways. Appellant's contention * * * that there are no abutting disks is manifestly in error.

Appellant's attack on Schlegel is similar in many respects to that launched on Binckley. First, appellant urges that Schlegel is

so ambiguous and unclear that it is nonenabling. For example, a cross-section line taken through a solid piece in Fig. 3 of Schlegel is not properly cross-hatched. The other cited ambiguities are similar in kind. All are typical of errors the correction of which would have been obvious to one of ordinary skill, and thus all fail to render Schlegel nonenabling.

Appellant also alleges that Schlegel fails to meet certain of the limitations appearing in his claims, listing them as follows:

1) abrupt turns of claims 22 and 65;

2) "axially separated rows" of claim 65;

3) "increase in flow area * * * to accommodate expansion of fluid" of claim 23;

4) "abutting disks" and passageways to "control velocity" as in claim 65; and

5) velocity control in all of these claims.

In support of the first of these contentions, the appellant cites expert testimony, adduced at the Texas trial, which he characterizes as being "to the effect that although the fluid turns in Schlegel, it does so in such a large flow area that it is not a turn from a fluid dynamic standpoint." We have reviewed the testimony in question, and cannot accept this characterization. The expert, in fact, agreed that Schlegel describes making the fluid turn. Indeed, Schlegel teaches making the fluid undergo right angle turns, and, as the board stated, right angle turns are "abrupt turns." That these turns may not be the sole or even primary mechanism for reducing pressure is irrelevant when the appealed claims are silent on this score.

The allegation that there are no "axially separated rows" in Schlegel is fallacious, as is apparent from Fig. 2 of that reference, which shows such rows. Similarly, the elementary geometrical observation that the area of a circle increases as the square of its radius dictates that Schlegel has an "increase in flow area." As stated by the board, the fact that Schlegel attaches no special significance to this particular arrangement is immaterial where, as here, we are comparing the *structure* disclosed in the reference with the claimed *structure*. Appellant has also failed to convince us of any error in the board's finding that Schlegel has abutting disks.

Appellant's remaining argument is that Schlegel does not teach velocity control. We disagree. Schlegel's entire purpose is to reduce pressure and, hence, prevent supersonic velocities in steam. This is velocity control. Appellant would limit the term "velocity control" to the specific phenomena he relies upon to accomplish velocity reduction in his device, but the claims do not even suggest such a limitation.

*The § 102 Rejection On Toth*

In addition to sustaining the rejections described above, the board, under 37 CFR 1.196(b), also rejected claims 1–11, 13, 20, 21, and 22 as anticipated by Toth. Appellant does not argue that the *claimed structure* is not identical to that of Toth, but instead argues that Toth functions differently to solve a different problem; that his invention is unobvious from that of Toth; and that language appearing in the preambles of rejected independent claims 1 and 21 distinguishes his invention from Toth's.

As above, appellant's arguments respecting functional differences between its valve and Toth's filter lack foundation in the limitations appearing in the claims. Thus, it is immaterial that Toth teaches the use of his structure as a filter while appellant would use his as a fluid control device, or that Toth's filter would work best only under laminar flow conditions, while appellant finds turbulent flow conditions superior. That velocity *increases* may occur within a Toth filter is irrelevant, as this is nevertheless velocity *control*, and the claims require nothing different. Aside, perhaps, from the preamble, as will be discussed next, the claims are not limited to devices having these possibly distinguishing functions, and so appellant cannot rely on them to establish patentability.

Appellant also argues that Toth is taken from a non-analogous art, that it teaches

away from appellant's invention, and that Toth, though known to individuals skilled in the valve art, was not at all recognized as containing a solution to the long-standing problems of cavitation, erosion, and noise. These arguments, however, are not germane to a § 102 rejection. Equally lacking in persuasiveness is appellant's emphasis on the verdict of nonobviousness in the Texas trial, even though Toth was before the jury. Anticipation under § 102 is a question of law and we will decide it on the documentary evidence.

Appellant's final contention relates to limitations he alleges appear in the preambles to the independent claims. The most restrictive preamble language, identical in claims 1 and 21, is:

In a high energy loss flow control device for installation in a fluid transfer system where a potentially destructive or noise generating fluid pressure differential exists:

Appellant's arguments respecting this language are that it points out the invention, the context in which it is useful, and the problem which it solved, thus distinguishing the claimed invention from Toth's. The solicitor responds that the board considered the preambles and properly found nothing therein which served to distinguish over Toth, and that, in any event, the language cannot distinguish as it merely states a purpose or intended use, and the remainder of the claim completely defines the invention independently of the preamble.

It is often difficult to decide whether a preamble is a limitation on a claim. We need not decide whether this preamble is a limitation, however, because we agree with the board that even if it is a limitation, it does not distinguish the claimed subject matter from the structure disclosed by Toth.

The first clause in the preamble is "In a high energy loss flow control device." The board regarded the term "high energy loss" as "relative and involv[ing] subjective de-

terminations for which appellant's disclosure offers no explicit guidelines." We agree. The preamble language therefore fails to distinguish over Toth's filter if any appreciable energy loss occurs therein. This is indeed the case, for, as the board appreciated, the tortuous fluid paths in Toth's filter dissipate the fluid's energy, as simple physics dictates they must. As to the term "flow control device," it might be argued that although filters typically impede flow, this is an unavoidable and often undesirable incident to their operation rather than an intended result. Toth's filter, however, works by dividing and abruptly altering the course of fluid flow; thus flow control is an essential principle of its operation. Toth is, therefore, a flow control device. The phrase "fluid transfer system" is broad enough to encompass a straight length of pipe, and serves to distinguish nothing. The final clause, "where a potentially destructive or noise generating fluid pressure differential exists," also fails to add any material limitation. Any pressure differential exceeding nominal values must be deemed "potentially destructive," especially where the claim leaves unspecified what it is that may be destroyed. We may be certain that a pressure differential exists around Toth's filter because he discusses decreasing the pressure drop across his filter in his specification. The same may be said of "noise generating;" since the claim fails to specify a minimum amount of noise, the language is broad enough to encompass even faint sounds such as those created in household plumbing upon the opening of various valves to be found in such systems, with which we are all familiar. We may assert without reasonable fear of contradiction that, at the very least, Toth's filter produces sounds of comparable loudness. Thus, a careful reading of the preamble reveals no limitation preventing the conclusion that the appealed claims read on Toth's filter.

The decision of the board is *affirmed.*

AFFIRMED.

APPENDIX

Fig. 1.

Fig. 2.   Fig. 3.

Figures 1-3 of U.S. Patent
3,514,074 to R.E. Self

Figures 3A-5 of U.S. Patent
3,514,074 to R.E. Self

Figures 1-3 of U.S. Patent
1,243,134 to G.S. Binckley

_Abb.1_

_Abb.2_

Figures 1 and 2 of German
Patent Application 1,008,977
of E. Schlegel

Figures 1-3 of U.S. Patent
3,397,794 to L.R. Toth et al